Filed 9/1/15  Berg v. Torigian CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DEBRA BERG,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>ANDRE TORIGIAN et al.,<br><br>    Defendants and Appellants. | F069727<br><br>(Super. Ct. No. 14CECG00146)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Mark W. Snauffer, Judge.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett, David J. Cooper and Connie M. Parker for Defendants and Appellants.

Adleson, Hess & Kelly, Phillip M. Adleson and Nicole S. Adams-Hess for Plaintiff and Respondent.

-ooOoo-

Andre and Takoohi Torigian (collectively the Torigians) sued Gerald S. Shmavonian (Shmavonian), WT Capital Lender Services (WT Capital), and Debra Berg (Berg), WT Capital's senior vice president, for causes of action arising out of the attempted nonjudicial foreclosure of commercial property the Torigians owned. Judgment in the underlying action was entered in Berg's favor after the trial court sustained her demurrer to some causes of action and her summary judgment as to the remaining causes of action alleged against her.

Berg later sued the Torigians for malicious prosecution. The Torigians filed a motion to strike the malicious prosecution complaint pursuant to Code of Civil Procedure section 425.16,[1] commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute (the anti-SLAPP motion). The trial court denied the anti-SLAPP motion.

The Torigians appeal, asserting the trial court erred in denying their motion because (1) there was probable cause to instigate and pursue the underlying action; (2) the underlying action was not initiated or pursued for a malicious purpose; and (3) Berg did not suffer any damages. We agree with the Torigians' contention that Berg failed to make a prima facie showing of malice and therefore failed to carry her burden of showing a probability of prevailing on the merits of her malicious prosecution claim. Accordingly, we reverse and remand the matter with directions to the trial court to grant the anti-SLAPP motion.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2006, the Torigians borrowed $80,000 from Shmavonian. The loan was confirmed by a promissory note and secured by a deed of trust on commercial property the Torigians owned. The initial trustee on the deed of trust was Chicago Title Company (Chicago Title). The Torigians paid off the loan in March 2006 by delivering

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2.

two checks to Shmavonian: one for $80,000 from the Torigians' personal account and the other an interest payment of $667.67 from Andre's business account.

Although the Torigians repaid the loan, Shmavonian did not reconvey the deed of trust. When Andre contacted Chicago Title to ask about the status of the reconveyance, the escrow officer provided him with photocopies of her telephone notes and correspondence to Shmavonian, which included an unsigned draft of a substitution of trustee and full reconveyance form purporting to substitute Shmavonian as trustee on the deed of trust and reconvey the estate held thereunder, and a January 30, 2008, facsimile cover sheet to Shmavonian from Chicago Title advising him to sign and notarize the form, and return the original to Chicago Title. According to Andre, Shmavonian told Takoohi that he would sign the reconveyance after she helped him persuade Andre's friend to pay on an unrelated debt the friend allegedly owed Shmavonian. The Torigians, however, refused to get involved. For the next few years, the Torigians did not have any contact with Shmavonian.

In July 2010, Shmavonian retained WT Capital as his agent and instructed it to initiate a nonjudicial foreclosure against the Torigians' property pursuant to the deed of trust. Shmavonian declared under oath that the Torigians had defaulted on the $80,000 loan and authorized WT Capital to prepare a notice of default (NOD) and notice of sale (NOS). After WT Capital recorded a NOD and election to sell under the deed of trust, Andre took copies of the cancelled checks and the reconveyance Chicago Title prepared to WT Capital. He spoke with Jessica Hermosillo, an assistant trustee sales officer whose name appeared on the NOD, and explained the situation to her. She told Andre that Shmavonian may have forgotten the debt had been paid and told him she would relay the information to her supervisor, Berg, who was in charge of and handling the foreclosure. Andre left copies of the documents.

On August 3, 2010, Berg spoke with Shmavonian regarding the Torigians' claim that the note had been paid. Shmavonian told Berg the note had not been paid, the

amounts stated in the declaration of default were still due, and the Torigians' payments were for other loans. That same day, WT Capital obtained a trustee's sale guaranty (TSG), which showed the liens and encumbrances of record against the property. The TSG confirmed the deed of trust was still of record and had not been reconveyed to the Torigians. From the face of the cancelled checks, it was not clear what loan the checks were for, as the memo section of one check simply stated "Loan Payment in full" and the memo section of the other check stated "GERALD SHMAVONIAN INTEREST." Neither check expressly indicated it was in payment for the loan in question.

After the Torigians received a second NOD from WT Capital, Andre took the cancelled checks, his business and personal check ledgers, and his check carbons, and returned to WT Capital. Andre spoke with Berg and tried to explain the situation; he told Berg he had records showing they did not owe Shmavonian and the foreclosure was a mistake. According to Andre, it was apparent to him that Berg did not want to talk to him or receive information that would jeopardize her or WT Capital's ability to foreclose on the property; Berg refused to discuss the matter with him or look at the records he brought. Andre asked Berg to contact Chicago Title, as they were the trustee and knew the background of the loan, but Berg refused. Berg explained to Andre that Shmavonian told her the two March 2006 checks were payment on some other loan, but she did not specify what that loan was and Andre did not know what she was talking about. Berg also told Andre that they were working for Shmavonian and she was handling the foreclosure for him. Andre claimed Berg refused to listen to him or give him an opportunity to talk; instead, she pointed him to the door and told him he needed to find an attorney, as it was the only way to defend himself. Andre could not believe Berg refused to talk to him in light of the seriousness of foreclosure and he "felt like cold water had been poured all over" him.

Andre sought legal counsel. On August 29, 2010, Hagop T. Bedoyan, a partner with the law office of Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, LLP,

4.

sent Shmavonian a letter, in care of WT Capital, in which he explained that the Torigians had paid the loan, and demanded that Shmavonian immediately reconvey his interest in the deed of trust or the Torigians would be forced to file a lawsuit to quiet title. That same day, Bedoyan emailed Hanno Powell, who Bedoyan understood was WT Capital's president, advising him about the foreclosure, that the Torigians believed they did not owe Shmavonian anything, and that the deed of trust should be reconveyed and the foreclosure cancelled. When Powell did not respond, Bedoyan sent a follow-up email on September 20, 2010, asking Powell if he had reviewed the prior correspondence.

On October 18, 2010, Bedoyan wrote Powell once more, as Powell had not responded and the foreclosure remained active. Bedoyan referenced the evidence of loan repayment that had been provided previously; stated that WT Capital could be liable for a wrongful foreclosure sale; explained that while there was a qualified privilege related to the trustee's recordation of a NOD, the privilege does not shield a trustee from malicious conduct such as where a trustee knowingly pursues a wrongful foreclosure sale; and stated that the Torigians were prepared to file a lawsuit against Shmavonian, which would include WT Capital as a defendant, if WT Capital did not rescind the NOD.

The next day, Berg responded to Bedoyan by email. She explained that neither WT Capital nor Powell represented Shmavonian in a legal capacity, and the correspondence had been forwarded to Shmavonian, who assured WT Capital that the loan obligation was due and proper. Berg further explained that WT Capital's role as trustee under the deed of trust was not to be a finder of fact or to determine between disputing parties whether a loan was properly chargeable, and recommended Bedoyan "pursue whatever legal avenues you deem appropriate on behalf of your clients."

Bedoyan responded to Berg by email that day, stating he "wanted to try one more time before filing suit against Mr. Shmavonian and your company, as Trustee under the deed of trust." Bedoyan again explained: under cases he had cited, trustees can be liable for pursuing improper foreclosure actions since a trustee acts as an agent of the

5.

beneficiary; in order to obtain complete injunctive relief, WT Capital would have to be named as a party defendant; and he had provided WT Capital with ample evidence the loan had been fully repaid. Bedoyan advised that another attorney with his firm would be handling the litigation.

On October 27, 2010, a substitution of trustee was recorded, substituting WT Capital for Chicago Title as trustee under the deed of trust, along with a notice of trustee's sale as instructed by Shmavonian.

*The Underlying Action*

On October 28, 2010, the Torigians filed their verified complaint against Shmavonian, WT Capital and Berg. Against WT Capital and Berg, the Torigians alleged causes of action for quiet title, declaratory relief, slander of title, negligence, and injunction; they also alleged a cause of action for civil conspiracy against Berg. The Torigians alleged the NOD falsely represented they owed Shmavonian on the loan, Shmavonian or WT Capital caused the NOD to be recorded, and WT Capital recorded the NOS in willful or reckless disregard of their ownership rights in the property. On the quiet title claim, the Torigians alleged that Shmavonian adversely claimed he continued to be the beneficiary under the deed of trust and was entitled to foreclose on the property; by Shmavonian's agreement with WT Capital and Berg, the defendants noticed a foreclosure sale of the property; the Torigians were seeking to quiet title against all adverse claims; and the adverse claims were without merit, as Shmavonian had no right to maintain a security interest in the property, and WT Capital and Berg had no right to notice and pursue a foreclosure sale. On the declaratory relief claim, the Torigians alleged an actual controversy had arisen, as WT Capital and Berg claimed rights and privileges to foreclose on the property.

For the slander of title cause of action, the Torigians alleged, on information and belief, that Shmavonian, WT Capital and Berg falsely published the NOD or NOS without justification, as they knew or should have known the foreclosure sale was

6.

unlawful; and that WT Capital's and Berg's actions were not privileged, since they refused to suspend the foreclosure sale or perform a reasonable investigation after being notified the foreclosure sale was unlawful. The negligence claim alleged that Berg breached her duty to the Torigians as their agent by continuing to actively pursue the foreclosure sale despite being put on notice of its unlawfulness. Finally, the Torigians alleged, on information and belief, that Berg conspired with Shmavonian to unlawfully foreclose on the property, and to commit slander of title and negligence, and they agreed to continue the unlawful pursuit of the foreclosure sale after the Torigians provided them with evidence that the loan had been paid in full.

The following day, Don J. Pool, an attorney with the law firm Powell & Pool, who represented Berg and WT Capital in the underlying action, contacted the Torigians' attorneys and asserted Berg was not a proper defendant because she was an employee of the foreclosure trustee. Pool requested that the Torigians dismiss Berg from the lawsuit, but they did not do so.

The Torigians applied for a temporary restraining order (TRO) to stop the foreclosure sale. The trial court issued the TRO and set a hearing on the Torigians' request for a preliminary injunction. On November 24, 2010, without opposition from WT Capital and Berg, the Torigians obtained the preliminary injunction prohibiting the defendants from transferring, selling or encumbering the property.

On November 29, 2010, Berg filed a declaration of nonmonetary status on WT Capital's behalf pursuant to Civil Code section 2924*l*, in which she represented WT Capital was the trustee under the deed of trust, and she reasonably believed it had been named as a defendant solely in its capacity as trustee and not due to any act or omission in the performance of its duties as trustee. Berg stated that WT Capital agreed to be bound by whatever nonmonetary order or judgment the trial court issued regarding the deed of trust. Berg and WT Capital also filed a demurrer and motion to strike the original complaint. The Torigians later moved for leave to file a late objection to the

7.

declaration of nonmonetary status. WT Capital did not oppose the motion and it was granted. In April 2011, the Torigians filed an objection to the declaration of nonmonetary status. Because of the Torigians' objection, WT Capital and Berg remained active defendants in the case.

On March 9, 2011, the trial court overruled the demurrer as to the civil conspiracy claim, but sustained the demurrer with leave to amend as to the remaining causes of action alleged against Berg. On the quiet title action, the trial court ruled that, while WT Capital was a proper defendant because the Torigians alleged it had an adverse legal interest in the property by wrongfully instituting the foreclosure proceedings and failing to reconvey the deed of trust, Berg was not, as the Torigians had not alleged she had an individual interest in the property. The declaratory relief claim failed because the complaint did not allege Berg initiated the foreclosure sale. The trial court sustained the demurrer on the slander of title and negligence claims because the complaint did not state facts sufficient to set forth a claim that Berg recorded the NOD or NOS in her individual capacity. The injunction claim failed because Berg was not the trustee and had no power to conduct a trustee's sale, and the complaint alleged only that WT Capital, not Berg, tried to sell the property.

In March 2011, the Torigians filed their first amended verified complaint, which added the following allegations against Berg on information and belief: (1) as a matter of law, corporate officers such as Berg are liable individually for their torts or wrongful acts; (2) Shmavonian met with Berg and WT Capital during the summer of 2010 for the purpose of starting foreclosure proceedings, knowing the lawful trustee would not foreclose on the property because the loan was repaid; (3) in July 2010, Berg created a false spreadsheet for Shmavonian that purported the Torigians had made only one $1,000 payment on the loan; (4) on July 26, 2010, Shmavonian and WT Capital recorded the false NOD under Berg's supervision and direction as senior vice president of WT Capital; (5) Berg and WT Capital refused to stop the foreclosure proceedings despite

8.

the Torigians' notification that the loan had been paid off; (6) WT Capital posted the NOS at Berg's direction; (7) Berg and WT Capital were not the lawful trustee under the deed of trust; (8) Berg and WT Capital recorded the substitution of trustee after being on notice the loan was paid in full; and (9) after the preliminary injunction was issued, Berg continued to make plans with Shmavonian to foreclose on the property.

The first amended complaint repeated the allegations in the original complaint that (1) WT Capital and Berg noticed the foreclosure sale without any right to notice and pursue the foreclosure sale; (2) WT Capital and Berg claimed rights and privileges to foreclose on the property; (3) WT Capital and Berg falsely published the NOD and NOS without justification, and WT Capital's and Berg's actions were not privileged; (4) Berg owed the Torigians a duty as the acting trustee under the deed of trust to abstain from, or suspend pursuit of, the unlawful foreclosure sale; and (5) Berg engaged in a conspiracy with Shmavonian to unlawfully foreclose on the property.

The Torigians' depositions were taken in April 2011. Andre testified that Berg never indicated to him that she was personally claiming an interest in the property, no one ever told him she was claiming an interest in the property, he had no idea if Berg was claiming an individual interest in the property, and to his knowledge, Berg's only role in the entire transaction was that she worked for WT Capital and WT Capital was hired by Shmavonian. Andre was not aware of any sort of agreement between Shmavonian and Berg, as he had not talked to Shmavonian and only talked to Berg that one day. Andre admitted the only thing Berg told him was that she was acting on Shmavonian's behalf in order to conduct the foreclosure.

Takoohi, who said she never had a personal conversation with Berg, did not know if Shmavonian and Berg had conspired to unlawfully foreclose on the property or about any plan or scheme to do so. Takoohi denied that Berg was making a claim to any sort of interest in the property. Takoohi did not know if Berg had done anything on her own

9.

with respect to the foreclosure apart from her employment with WT Capital, and did not know whether Berg believed the note had been paid.

Andre admitted he was "upset" with Berg because he believed she should have listened more carefully to his side of the story and performed a more thorough investigation of the parties' dispute. Andre testified he was "upset [Berg] didn't listen to me," he thought WT Capital was a "referee" who should have listened to "both ends" of the story, and if Berg could have given him five minutes of her time, he could have told her what was going on. Andre thought it was Berg's job to contact people to determine whether the Torigians actually owed the amounts Shmavonian claimed were due. Andre felt like he "wasn't welcome" and that he, and his documentation, were "garbage." He thought that if Berg called Chicago Title, she would believe Chicago Title since it was a neutral party. Andre also testified that he did not have "anything bad or good against Mrs. Berg," as she was doing her work, and he had come to her for mercy.

In April 2011, Berg demurred and moved to strike the first amended complaint. In June 2011, the trial court sustained Berg's demurrer to the causes of action for quiet title, declaratory relief and injunction without leave to amend, but overruled it as to the claims for slander of title, negligence and civil conspiracy. With respect to the quiet title cause of action, the trial court found that the Torigians failed to plead facts showing Berg had an individual interest in the property, noting that she was not the trustee, and while she may have directed the filing of papers on behalf of another party who claimed an interest in the property, she had never asserted she had an interest in the property in her individual capacity. The trial court agreed with the Torigians that a corporate officer or director remains liable for his or her individual torts, but found that where, as here, the elements of the "tort" are not satisfied because the director never acquired a personal interest in the property, no cause of action is stated. The trial court found the declaratory relief cause of action and claim for injunctive relief both failed because Berg had no right to foreclose on the property, as she was not the trustee and was not alleged to be

10.

foreclosing on her own interest in the property, and no facts were alleged that Berg, as opposed to WT Capital, ever tried to sell the property.

In July 2011, the Torigians filed second and third amended verified complaints. Both alleged causes of action for slander of title, negligence and civil conspiracy against Berg. Berg filed a verified answer to the third amended complaint.

In March 2012, Berg filed a motion for summary judgment on the remaining causes of action in the third amended complaint, which the Torigians opposed. Berg's deposition was taken in April 2012. When asked if she was paying for her own defense, she responded that she had not written a personal check to date and had not signed any fee agreement. Berg, however, knew it was a "real possibility" that WT Capital might expect her to pay for her own defense. Berg testified she met with Shmavonian for the first time in July 2010, when he told her he wanted her to process a nonjudicial foreclosure of the Torigians' property because the loan was in default. Berg started to question the truthfulness of the information Shmavonian provided when Andre came into the office disputing the debt after his conversation with Hermosillo. Hermosillo told her that Andre was disputing that the debt was still due and he had provided copies of the cancelled checks. Berg reviewed the two checks on or before August 3, 2010. Thereafter, Shmavonian instructed her to proceed with the foreclosure, so she did so knowing the Torigians had viable remedies to pursue and it was not her job to determine who was right since there was a bona fide dispute.

On July 27, 2012, the trial court issued an order granting Berg's summary judgment motion in its entirety.[2] With respect to slander of title, the trial court found that the Torigians could not establish that the NOD was published without justification, and publication of the NOD and NOS was privileged. The trial court rejected the Torigians'

---

[2] WT Capital also moved for summary adjudication on the slander of title and negligence claims alleged against it. The trial court also granted WT Capital's motion.

11.

contention that Berg acted with malice because she lacked reasonable grounds for believing there was a default after she was presented with copies of the cancelled checks, as the evidence offered in support of those facts was irrelevant, inadmissible and unavailing. On the negligence claim, the trial court found that Berg did not owe the Torigians a duty and, even if a duty were owed and was breached, Berg's actions were privileged. Finally, since summary adjudication was appropriate on the slander of title claim, the civil conspiracy claim failed as well. Judgment in Berg's favor was entered on August 6, 2012. In October 2012, Berg moved for attorney fees in the amount of $164,385.60 based on the attorney fees provision in the deed of trust. The trial court denied the motion.

As to the remaining defendants, trial was bifurcated. The first phase, a jury trial, addressed the Torigians' claims for monetary damages against Shmavonian; WT Capital did not participate in that phase of the trial. The jury returned a general verdict in the Torigians' favor. The second phase, a court trial, addressed the equitable, nonmonetary claims against Shmavonian and WT Capital. Judgment was entered on January 30, 2013, as follows: (1) on the Torigians' monetary claims against Shmavonian, judgment was entered against Shmavonian in the amount of $16,500; and (2) on the causes of action for quiet title, declaratory relief and permanent injunction, judgment was entered against Shmavonian and WT Capital, with the trial court enjoining the trustee's sale and ordering WT Capital to execute and record a reconveyance of the deed of trust, a notice of rescission of the notice of default, and a notice of rescission of the notice of trustee's sale.[3]

---

[3] Thereafter, the Torigians and WT Capital both filed motions for attorney fees and costs; the trial court granted the Torigians' motion and denied WT Capital's motion. WT Capital appealed the trial court's order. Just short of a week before oral argument in this case, Berg filed a letter brief asking us to take judicial notice of our nonpublished opinion in that appeal. Berg, however, failed to cite any authority for that request or explain why the opinion is relevant to this appeal. At oral argument, her attorney argued we should grant the request because it clarifies a point in the Torigians' brief concerning who was the prevailing party and contains facts that are

12.

*The Malicious Prosecution Action*

In January 2014, Berg filed this malicious prosecution action against the Torigians. The complaint alleged the underlying action was commenced at the Torigians' direction, and they maliciously filed and continued to prosecute the underlying action against Berg without probable cause, based on false and unsubstantiated verified allegations, for the purpose of harassing and annoying Berg, and forcing her to unnecessarily incur attorney fees and costs. The complaint further alleged that by filing pleadings and falsifying verified discovery responses, the Torigians continued to maintain the injunction and maliciously prosecute the underlying action against Berg even after the Torigians admitted under oath that they had no facts or evidence to support the material allegations against her in their verified pleadings and the trial court sustained Berg's demurrer. Berg asserted the Torigians acted without probable cause in prosecuting each cause of action alleged in the verified pleadings as they did not honestly or reasonably believe there were grounds for those causes of action. Berg asserted she was damaged in a sum in excess of $164,000 in defending the underlying action.

*The Anti-SLAPP Motion*

The Torigians filed an anti-SLAPP motion, in which they asserted Berg could not show a probability of success on the merits of her malicious prosecution claim as she could not show the underlying action was instigated and pursued without probable cause and with malice. The Torigians argued there was probable cause to proceed with the wrongful foreclosure suit against Berg because, as the senior officer of WT Capital, Berg could incur personal liability for WT Capital's torts if she participated in the wrong or authorized it to be done, and Berg's actions were not privileged because she knowingly

---

relevant to the Torigians' argument on probable cause. We deny Berg's request as it is not properly before us (see Cal. Rules of Court, rule 8.252(a)), and the nonpublished opinion is not relevant to our determination of the issues on appeal. (See *Alvarez v. Brookstone Co., Inc.* (2011) 202 Cal.App.4th 1023, 1029–1030, fn. 6.)

pursued a wrongful foreclosure sale. They asserted they did not proceed with the wrongful foreclosure lawsuit with any nefarious intent and therefore Berg would not be able to prove they acted with malice. The Torigians also argued that Berg's lawsuit failed under the doctrine of res judicata, as Berg was attempting to relitigate her alleged entitlement to attorney fees as damages, which had been decided against her when her motion for attorney fees in the underlying action was denied.

Berg filed an opposition to the anti-SLAPP motion, in which she argued the evidence in the underlying action showed she could establish a probability of success on her malicious prosecution claim, and the doctrine of res judicata did not apply. In reply, the Torigians argued they were justified in suing all actors who participated in the wrongful foreclosure on a paid note, including Berg, and the issuance of the preliminary injunction supported probable cause. The Torigians also argued, for the first time, that Berg had no damages, since she denied incurring attorney fees.

The trial court denied the anti-SLAPP motion, finding that Berg met her burden of showing a likelihood of prevailing on her malicious prosecution claim. The trial court explained that the Torigians' deposition testimony tended to support Berg's contention they had no factual basis for their claims against her for conspiracy to engage in wrongful foreclosure, slander of title, or negligence, and given the lack of factual support, as well as the likelihood that Berg's actions in conducting the foreclosure were privileged, Berg had satisfied her burden of showing probable cause may not have supported the Torigians' claims. The trial court found Berg presented admissible evidence that suggested the Torigians brought their claims against her with malice. The trial court rejected the Torigians' argument that the doctrine of res judicata barred Berg's complaint. The trial court noted that the Torigians were arguing for the first time in the reply brief that Berg could not prevail because she could not prove damages, and found it would be unfair to grant the motion on this basis without giving Berg a chance to respond. Nevertheless, the trial court found the Torigians failed to show Berg never incurred any

14.

attorney fees at any time in the case, that she was not at any point obligated to pay fees, or that she did not have to reimburse WT Capital for fees incurred in defending her.

## DISCUSSION

*Standard of Review*

Section 425.16, subdivision (b)(1) states that a cause of action that arises from any act by the defendant that is in furtherance of the defendant's "right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is subject to a special motion to strike unless the plaintiff can establish there is a "probability that the plaintiff will prevail on the claim."

The phrase "'right of petition or free speech under the United States or the California Constitution [performed] in connection with a public issue'" is defined in section 425.16, subdivision (e). As pertinent here, the definition of the phrase includes "any written or oral statement or writing made before a … judicial proceeding." (*Id.*, subd. (e)(1).)

The anti–SLAPP statute is designed to deter and quickly dispose of frivolous litigation. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 311–312 (*Flatley*).) The statute allows the trial court to evaluate the lawsuit at an early stage in a manner similar to summary judgment. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) The granting of an anti-SLAPP motion results in dismissal of the claims on the merits and entitles the defendant to recover costs and attorney fees. (*Ibid.*; § 425.16, subd. (c)(1).)

In ruling on a special motion to strike, the trial court follows a two-step analysis. (*Smith v. Adventist Health System/West* (2010) 190 Cal.App.4th 40, 50.) The moving defendant carries the initial burden to show the challenged cause of action arises from protected free speech or petitioning activity. (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1387.) The burden is satisfied by demonstrating that the conduct underlying the plaintiff's claim fits into a category of protected activity set forth

15.

in section 425.16, subdivision (e).  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

If the trial court finds the defendant's threshold showing has been made, the burden shifts to the plaintiff to produce evidence establishing a probability that he or she will prevail at trial on the cause of action.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  To meet this burden, the plaintiff must plead and substantiate a legally cognizable claim for relief.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  "'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'" (*Ibid.*)  The evidence favorable to the plaintiff is accepted as true in this analysis, while the defendant's evidence is evaluated to determine if it defeats the plaintiff's claim as a matter of law.  (*Flatley*, *supra*, 39 Cal.4th at p. 326.)  The motion will not be granted unless both prongs of the statute are established.  (*Navellier*, *supra*, 29 Cal.4th at p. 89.)  A plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP."  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*).)

We independently review the trial court's order denying the anti-SLAPP motion, engaging in the same two-step process as the trial court to determine if the parties have satisfied their respective burdens.  (*Flatley*, *supra*, 39 Cal.4th at pp. 325–326; *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266–267.)  "'We consider "the pleadings, and supporting and opposing affidavits … upon which the liability or defense is based." [Citation.]  However, we neither "weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]'" (*Flatley*, *supra*, at p. 326.)  We further observe that the anti-SLAPP statute is to be broadly construed.  (§ 425.16, subd. (a).)

16.

Because there is no dispute that Berg's malicious prosecution claim arises from conduct that is protected under section 425.16,[4] we must determine whether Berg demonstrated a probability of prevailing on her claim.

*Probability of Prevailing*

The elements of a cause of action for malicious prosecution are (1) a favorable determination on the merits of the underlying action, (2) which was brought without probable cause, and (3) which was initiated or maintained with malice. (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 740; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 226 (*Daniels*).) For the reasons discussed below, the trial court erred by denying the Torigians' anti-SLAPP motion because Berg failed to carry her burden of making a prima facie showing that the underlying action was prosecuted by the Torigians with malice.

Our Supreme Court has explained that the malice element of malicious prosecution claims "'relates to the subjective intent or purpose with which the defendant acted in initiating the prior action. [Citation.] The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose. [Citation.] The plaintiff must plead and prove actual ill will or some improper ulterior motive.'" (*Soukup*, *supra*, 39 Cal.4th at p. 292, italics omitted.)

In the context of malicious prosecution claims, "[i]mproper purposes can be established in cases in which, for instance (1) the person bringing the suit does not believe that the claim may be held valid; (2) the proceeding is initiated primarily because of hostility or ill will; (3) the proceeding is initiated solely for the purpose of depriving the opponent of a beneficial use of property; or (4) the proceeding is initiated for the

---

**4** See *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733–741 (*Jarrow*) [malicious prosecution action based on underlying civil litigation triggers the first prong of the anti-SLAPP statute].)

17.

purpose of forcing a settlement bearing no relation to the merits of the claim." (*Daniels*, *supra*, 182 Cal.App.4th at p. 224.)

As Berg has provided no direct evidence of any malice by the Torigians in their prosecution of the underlying action, we consider whether Berg has produced circumstantial evidence from which malice might reasonably be inferred. (*Daniels*, *supra*, 182 Cal.App.4th at p. 225 ["'Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence.'"].) No evidence has been presented showing the underlying action was prosecuted to deprive Berg of the beneficial use of property or to force a settlement that bore no relation to the merits of the claim. Andre denied in his declaration that he and Takoohi brought or pursued the underlying action with any malicious intent; instead, they filed the lawsuit to stop the impending wrongful foreclosure and to petition for redress through the judicial system and named all defendants they believed were responsible, including Berg.

Berg argues she provided evidence from which a reasonable person could infer the Torigians filed the underlying action against her for an improper motive. She asserts the Torigians did not have probable cause to name her as a defendant, as evidenced by their deposition testimony that they had no facts to show she had a personal interest in the property or conspired with Shmavonian.[5] Berg contends this lack of probable cause,

---

[5] "The presence or absence of probable cause is viewed under an objective standard applied to the facts upon which the defendant acted in prosecuting the prior case." (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1018.) "The test of determining probable cause is whether any reasonable attorney would have thought the claim to be tenable." (*Ibid.*) Under this test, "probable cause to bring an action does not depend upon it being meritorious, as such, but upon it being *arguably tenable,* i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 824.) "'"[P]robable cause is lacking 'when a prospective plaintiff and counsel do not have evidence sufficient to uphold a favorable judgment or information affording an inference that such evidence can be obtained for trial.'"'" (*Daniels*, *supra*, 182 Cal.App.4th at p. 222.)

coupled with the Torigians' testimony that they were upset with Berg for refusing to advocate for them or act as a referee in the foreclosure process, supports an inference of malice, and shows the Torigians named her as a defendant to punish, annoy or harass her for refusing to advocate for them or act as a referee in the foreclosure process. She further asserts malice can be inferred because the Torigians continued to prosecute the action despite knowing the allegations against her had no merit.

As Berg recognizes, malice cannot be inferred solely from a court's determination of the absence of probable cause to prosecute the underlying action. (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498; *Grindle v. Lorbeer* (1987) 196 Cal.App.3d 1461, 1465–1466 [explaining that to infer malice from the evidence supporting lack of probable cause, "the parties' prefiling behavior must have been clearly unreasonable"].) Malice, however, can be inferred when a party *knowingly* brings or maintains an action without probable cause. (*Daniels*, *supra*, 182 Cal.App.4th at p. 226.)

Here, even if there was a lack of probable cause to prosecute the underlying action, there is no evidence that the Torigians brought or maintained their action against Berg *knowing* they lacked probable cause to do so. At their depositions, taken six months after the action commenced, the Torigians essentially testified that they did not believe Berg was claiming an individual interest in the property, Berg's role in the transaction was as an employee of WT Capital, and they did not have personal knowledge of any agreement between Shmavonian and Berg. Berg asserts this testimony shows the Torigians did not believe their claims against Berg had merit. We disagree.

Although the Torigians testified they did not believe Berg had a personal interest in the property, this was not the basis upon which they named Berg as a defendant in their quiet title and declaratory relief claims. Instead, the Torigians asserted Berg was a proper defendant because she was a corporate officer of WT Capital who directed the filing of the foreclosure papers. While the Torigians did not personally know of any agreement between Shmavonian and Berg that might support the civil conspiracy claim, it remained

19.

a possibility that such an agreement could be uncovered through the discovery process. Their lack of personal knowledge on this issue does not mean they knew no agreement existed, yet continued to prosecute the conspiracy claim against her. (See *Jarrow*, *supra*, 31 Cal.4th at p. 743 [even if plaintiff and his or her attorneys are unable to develop any competent evidence during discovery to support their claims, without more, malice cannot be established]; but see *Daniels*, *supra*, 182 Cal.App.4th at p. 227 [continuation of a lawsuit may constitute malice where the factual allegations of the underlying complaint "were explicitly disproved by the presentation of prior sworn deposition testimony"].) Berg has not presented any evidence that the Torigians prosecuted their claims against her with the actual knowledge that those claims were not legally tenable.

Neither can malice be inferred from the Torigians' testimony that they were upset with Berg because she would not accommodate their request to investigate further. That the Torigians were upset and thought Berg should have done more is simply insufficient to support an inference that they were hostile toward Berg or acted with ill will in naming her as a defendant. As the Torigians point out, being upset is a common reaction when litigation ensues and it was natural for the Torigians to be upset with Berg over her apparent complicity in what they viewed as an attempt to steal their property. We agree with the Torigians that feelings of "'upset'" cannot, without more, support an inference that they acted maliciously in naming Berg as a defendant. No evidence has been presented even remotely suggesting the Torigians included Berg in the lawsuit because they wanted to punish, annoy or harass her, or they included her in the lawsuit for any other improper motive. To the contrary, Andre testified that he did not have anything against Berg, as he knew she was doing her job.

In light of the foregoing, Berg's proferred evidence does not support a reasonable inference that the Torigians prosecuted any part of the underlying action against Berg for an "'improper ulterior motive'" that was "'something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or

financial purpose.'" (*Soukup*, *supra*, 39 Cal.4th at p. 292.)  Accordingly, Berg failed to establish a prima facie case of malice and, on this basis, the trial court erred in denying the Torigians' anti-SLAPP motion.

## **DISPOSITION**

The trial court's order is reversed.  The matter is remanded with directions to grant the Torigians' anti-SLAPP motion.  Costs on appeal are awarded to the Torigians.

_____
KANE, Acting P. J.

WE CONCUR:


_____
DETJEN, J.


_____
FRANSON, J.

21.